**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**


TRACY PURVIS,                          :

      Plaintiff,                    :          Case No. 3:09cv00129

 vs.                                   :          District Judge Walter Herbert Rice
                                                   Magistrate Judge Sharon L. Ovington

MICHAEL J. ASTRUE,                     :
Commissioner of the Social
Security Administration,               :

      Defendant.                    :

====================================================================

## REPORT AND RECOMMENDATIONS[1]

====================================================================


I.    <u>**Introduction**</u>

      Plaintiff Tracy Purvis brings this case challenging the Social Security
Administration's denial of her applications for Supplemental Security Income (SSI) and
Disability Insurance Benefits (DIB). This Court has jurisdiction to review the
administrative denial of her applications. *See* 42 U.S.C. §§405(g), 1383(c)(3). The case
is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's
Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative
record, and the record as a whole.

      Plaintiff asserted in administrative proceedings that she is eligible to receive DIB
and SSI because she under a "disability" within the meaning of the Social Security Act.
In the present case, she seeks reversal of the administrative denials of her applications and

---

     [1] Attached hereto is a NOTICE to the parties regarding objections to this Report and
Recommendations.

a judicial award of benefits or, at a minimum, a remand of this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the administrative decision.

## II.    Background

### A.    Procedural History

Plaintiff protectively filed[2] SSI and DIB applications on January 11, 2005 asserting that she was under a "disability" mainly due to cognitive impairment. (Tr. 64, 83, 382-83). She asserted her applications that her disability prevented her from employment beginning in August 2002.

Following initial administrative denials of her applications, Plaintiff received a hearing before Administrative Law Judge (ALJ) Thomas R. McNichols. ALJ McNichols later issued the written decision concluding that Plaintiff was not under a disability and, therefore, not eligible to receive DIB or SSI. (Tr. 12-21). ALJ McNichols' decision is at issue in the present case.

### B.    Plaintiff and Her Educational and Work History

Plaintiff was thirty-two years old on the date her claimed disability began. She is consequently considered a "younger person" for purposes of resolving her DIB and SSI claims. *See* Tr. 19. She is considered to have a "limited" education because she completed school through the eleventh grade in special education classes. *See* Tr. 19, 88A, 266.

Plaintiff has attempted to work multiple jobs over the years but most of those jobs do not disqualify her from DIB or SSI eligibility because the jobs did not constitute substantial gainful activity. *See* Doc. #9 at 3 (citing Tr. 56-59); *see also supra*, §III(A)

---

[2]  A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits. It may be used to establish an earlier application date than when the Social Security Administration received the claimant's signed application. *See* http://www.ssa.gov/glossary.

(explaining the significance of "substantial gainful activity). Plaintiff's jobs included part-time work in a nursing home. *Id.* (citing Tr. 58). The Commissioner explains, "she engaged in substantial gainful activity for a year from 2001 as a nurse's aid and she worked part-time caring for her grandparents in 2006-2007." (Doc. #12 at 5)(citing Tr. 58, 73-76).

Plaintiff's primary problem is her limited cognitive skills. When she was in school at age fifteen, a school psychologist, reported that her prior IQ tests, taken in 1980, resulted in a full scale IQ of 74. (Tr. 179). At that time, she was placed in a developmentally handicapped program. *Id.* The school psychologist further reported that Plaintiff was IQ tested again in May 1983 when she scored verbal IQ 65, performance IQ 81, and full scale IQ 71. (Tr. 179). School officials continued her placement in the developmentally handicapped program. *Id.*

At the time of the school psychologist's report, Plaintiff was a first year high school student. Intelligence testing resulted in verbal IQ of 69, performance IQ of 92, and full scale IQ of 79. (Tr. 180). She was reading and spelling below the third-grade level. *Id.* Her arithmetic abilities were at the end of the fourth-grade level. *Id.* The school psychologist recommended continuing Plaintiff's placement in the developmentally handicapped program. (Tr. 181).

### C.    Dr. Deardorff

In March 2005 clinical psychologist Paul A. Deardorff, Ph.D. tested and evaluated Plaintiff at the request of the Ohio Bureau of Disability Determinations (Ohio BDD). (Tr. 265-71). Dr. Deardorff diagnosed Plaintiff with borderline intellectual functioning and major depressive disorder, recurrent, without psychotic features. (Tr. 270).

Dr. Deardorff administered intelligence and other tests. Plaintiff's IQ tests resulted in a verbal IQ of 68, performance IQ of 85, and full scale IQ of 74. (Tr. 268). Dr. Deardorff wrote, in part:

> The discrepancy between her Verbal and Performance Scale IQ is

> large and significant. Similar Verbal-Performance discrepancies are noted
> in the test records of children with emotional or neuropsychological
> difficulty. Further, children from background which neither model,
> encourage, or reinforce academic pursuits often display such test profiles.
> One or all of these factors may well interfere with Ms. Purvis'
> psychological functioning.

(Tr. 268). Dr. Deardorff also administered memory tests. The results indicated to Dr.
Deardorff that Plaintiff's "memory abilities are weak and fall in the moderately retarded
range or at about the 1st percentile for her age group." (Tr. 269).

Dr. Deardorff observed that Plaintiff appeared both depressed and anxious. (Tr.
267). He explained that she displayed downcast facial expression, spoke and moved
slowly, and appeared to have little energy. She maintained minimal eye contact. And she
"alluded to symptomatology somewhat suggestive of Posttraumatic Stress Disorder." (Tr.
267). Plaintiff reported to Dr. Deardorff that during her childhood, she had witnessed her
father abuse her mother. And Plaintiff reported that her father physically and emotionally
abused her as well. (Tr. 265).

Regarding her daily activities, Plaintiff told Dr. Deardorff that she did not often
leave her home. Dr. Deardorff wrote, "She watches television and performs household
chores. She spends considerable time with her former fiancé. She has no hobbies. She
sees her children on a monthly basis. She has no friends. She does not often see family
members." (Tr. 268). At the time of Dr. Deardorff's evaluation, Plaintiff lived with her
former fiancé and his parents. *Id*. Dr. Deardorff noted that Plaintiff had been married
previously at age twenty-four but divorced four years later. Plaintiff had four children
during her marriage. *Id*.

Dr. Deardorff thought that Plaintiff's ability to relate to others, including fellow
coworkers and supervisors, was moderately to seriously impaired by her emotional
difficulties. (Tr. 270). In support of this, Dr. Deardorff noted that Plaintiff had no
friends. He also noted Plaintiff would likely have difficulty relating adequately to others
and completing simple repetitive tasks. *Id.*

Dr. Deardorff believed that Plaintiff's mental ability to understand, remember, and follow simple instructions was moderately impaired by her emotional difficulties. He indicated that she would have no difficulty understanding simple instructions, but "her short-term memory skills were only marginally adequate ... and may deteriorate over extended time periods, slowing her performance in completing simple repetitive tasks." (Tr. 270).

Dr. Deardorff also opined that Plaintiff's mental ability to maintain attention, concentration, persistence, and pace was moderately impaired by her emotional difficulties. He thought that these abilities would deteriorate over extended time periods. (Tr. 270-271).

Dr. Deardorff thought that Plaintiff's ability to withstand the stress of pressures associated with day-to-day work activities was "seriously impaired by her emotional difficulties. Such stress may result in increased anxiety and decreased attention and concentration skills but might also exacerbate symptomatology suggestive of post-traumatic stress disorder, interfering with her ability to relate adequately to others." (Tr. 271).

### D.    <u>Other Evidence</u>

In March 2005 Vicki Casterline, a "medical consultant," reviewed Plaintiff's file. (Tr. 272-88). Casterline opined that Plaintiff's "education and mental functioning is in the borderline range." (Tr. 288). Casterline further opined that Plaintiff's condition did not meet any impairment set forth in the Regulation's Listing of Impairments.[3] (Tr. 272-82). Casterline believed that while Plaintiff "is limited socially and intellectually due to her emotional and cognitive condition, she still retains the ability to follow simple instructions and maintain attention for short periods of time in low stress settings where she does not have to interact much with others." (Tr. 288).

---

[3] The Listings are located in 20 C.F.R. Part 404, Subpart P, Appendix 1.

In June 2005 John S. Waddell, Ph.D. reviewed all the evidence in Plaintiff's file along with Casterline's assessment and stamped his agreement with Casterline's opinions. (Tr. 288). Dr. Waddell did not explain why he agreed with Casterline's assessment. He did not support his agreement with any reference to specific evidence. *See id*.

Plaintiff was seen at Focus Care and Behavioral Health Counseling Center from October 2005 through July 2006. (Tr. 326-56). She was initially diagnosed with a major depressive disorder (recurrent, moderate) and post-traumatic stress disorder. (Tr. 352).

At the ALJ's hearing in February 2008, Plaintiff testified that she continues to have problems with her nerves. (Tr. 403). She stopped drinking alcohol when she went into counseling. (Tr. 404). She noted that the psychiatrist had put her on Cymbalta, a depression medication, and they told her that if she drank when she was on it, it would hurt her. (Tr. 405). She reported having repeated nightmares about the abuse she suffered by her father. (Tr. 405).

Plaintiff testified that she also suffers from back pain that is constant. (Tr. 406-07). She is most comfortable lying down. (Tr. 408).

As to her activities, Plaintiff testified that she sometimes played solitary or pinball on her computer. (Tr. 412-13). She only obtained her drivers license two years before the ALJ's hearing. She accomplished this because her friend helped her study, and she was able to pass the second time she took the written test by listening to the questions instead of reading them herself. (Tr. 415).

A vocational expert testified at the hearing. She was asked to consider a person of Plaintiff's age, education and work experience who was limited to working with following limitations and restrictions:

- No climbing of ropes, ladders, or scaffolds;

- Not required to follow complex or detailed instructions;

- Not required to maintain concentration on a single task for longer than fifteen minutes at a time, that is with little, if any, concentration;

- No exposure to hazards such as dangerous machinery, unprotected heights;

- Simple, one or two-step job tasks;

- Occasional postural activities;

- No direct dealing or exposure to the general public; and

- Limited contact with co-workers and supervisors.

(Tr. 418-20). Considering a person with these limitations, the vocational expert identified a number of sedentary, light, and medium exertion jobs such a person could perform. *Id.*

## III. **Administrative Review**

### A. **"Disability" Defined**

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

B.    **ALJ McNichols' Decision**

ALJ McNichols resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations.  *See* Tr. 12-21; *see also* 20 C.F.R. §404.1520(a)(4), 416.920(a)(4).[4]  ALJ McNichols concluded at Step 2 of the sequential evaluation that Plaintiff had four severe impairments: "1) chronic low back pain; 2) depression and anxiety; 3) borderline intellectual functioning; and 4) a history of alcohol abuse."  (Tr. 15).  The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner Listing of Impairments.  (Tr. 15).

The ALJ assessed Plaintiff's Residual Functional Capacity (Step 4) as follows:

> [Plaintiff] has the residual functional capacity to perform light work[5] ... subject to: 1) occasional bending, squatting, stooping, kneeling, crouching, and crawling; 2) no climbing of ropes, ladders, or scaffolds; 3) no exposure to hazards; 4) low stress jobs with no production quotas; 5) simple one- or two-step tasks requiring little, if any, concentration (not required to maintain concentration on a single task for longer than 15 minutes at a time); 6) no complex or detailed instructions; 7) limited contact with co-workers and supervisors; and 8) no exposure to the general public.

(Tr. 16-17) (footnote added).  The ALJ also found at Step 4 that Plaintiff was unable to perform her past relevant work.  (Tr. 19).

At Step 5 the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy.  (Tr. 20).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.  (Tr. 14-21).

―――――――――――――――――

[4]  The remaining citations to the Regulations will identify the pertinent DIB Regulation with full knowledge of the corresponding SSI Regulation.

[5]  The Regulations define light work as involving the ability to lift " no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §404.1567(b).

## IV.    Judicial Review

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. DISCUSSION

### A. Step 3 and Listing 12.05C

#### 1.

Plaintiff contends that the ALJ erred at Step 3 of the sequential evaluation by finding that she did not meet the criteria for mental retardation set forth in Listing 12.05C. This argument is potentially dispositive since a finding in favor of Plaintiff at Step 3 would have streamlined the ALJ's evaluation. *See Combs v. Comm'r. of Social Security*, 459 F.3d 640, 649 (6th Cir. 2006)(en banc). Streamlined because an adult whose impairments meet or equal the criteria of a Listing is presumed be under a disability and is granted benefits without further evaluation. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

The Commissioner argues that the ALJ did not err at Step 3 and that substantial evidence supports the ALJ's determination that Plaintiff did not meet the criteria for mental retardation in Listing 12.05C.

#### 2.

Listing 12.05C describes the criteria necessary to establish a disability based on mental retardation. Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The first sentence of Listing 12.05 provides:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Subpart P, Appendix, §12.05. Plaintiff was required to show that she met this criteria "*and* any one of the four sets of criteria..." in §12.05. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)(emphasis in *Foster*). Section 12.05C's criteria consists of:

1. A valid verbal, performance, or full scale IQ of 60 through 70; and

2. A physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Subpart P, Appendix, §12.05C.

The ALJ determined that Plaintiff did not meet or equal Listing 12.05C for several reasons. He explained:

> First of all, there is no diagnostic corroboration of mental retardation. Although verbal IQ's have been relatively low and below 70 on some tests, the verbal IQ scores have been considered discrepant in comparison to her performance IQ scores, and diagnostically she has been considered to function at a borderline-to-low average range, not in the mentally retarded range (Exhibit B-1F and B-9F). She was classified as developmentally handicapped in school, but not specifically as mentally retarded; and she received mostly passing grades in high school before quitting due to pregnancy (Exhibit B-4E). She completed nurses aid training (Exhibit B-10E), and she appears to have earned SGA [substantial gainful activity]-level wages for some years (Exhibits B-2D and B-6D). She has a driver's license (even if the test was read to her). She drives and shops. Dr. Deardorff observed that her judgment appeared to be sufficient to make decisions affecting her future and to conduct her own living arrangements (Exhibit B-9F). Her phraseology and grammatical structure was suggestive of borderline functioning, and she could be followed easily from a conversational standpoint. Focus Care counseling notes even indicated that she had an estimated average IQ (Exhibit B-12F). Thus, diagnostic tests, clinical observations, claimant's developmental history, her vocational background, and her general functioning in routine activities of daily living are all inconsistent with the contention that she is mentally retarded. Section 12.05C criteria do not apply in this case.

(Tr. 16).

### 3.

Plaintiff contends that the ALJ erred by not directly addressing the validity of her IQ scores and by merely noting that Dr. Deardorff found IQ scores "consistent with borderline intellectual functioning." (Tr. 15). Plaintiff is correct.

While some of Plaintiff's IQ scores – specifically her performance and full scale IQ scores – fell within the borderline range of intellectual functioning, her verbal IQ scores consistently fell within the range of scores set forth in Listing 12.05C(1).

Plaintiff's verbal IQ test results have consistently ranged from 65 to 69. Social Security Regulations allow a Plaintiff to use the lowest IQ score on a given test (verbal, performance, or full-scale) to satisfy Listing 12.05C(1)'s requirement of a valid IQ score of 60 through 70. The Listings promise, "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQ's are provided in the Wechsler series, we use the *lowest* of those in conjunction with 12.05." Listing §12.00(D)(6)(c), Appendix 1 to Subpart P, Part 404 (emphasis added).

In rejecting Plaintiff's verbal IQ scores, the ALJ relied on Dr. Deardorff's note that the relatively low verbal IQ of 68 was "discrepant with the performance IQ score of 85." (Tr. 15)(citing Tr. 268). Dr. Deardorff did note that there was a discrepancy between Plaintiff's verbal and performance IQ scores, but he did not suggest that this was an indication of invalidity. Rather, Dr. Deardorff explained that the discrepancy could be indicative of emotional or neuropsychological difficulties. (Tr. 268). This constituted error because the ALJ overlooked or ignored Dr. Deardorff's explanation and, instead, selected only the evidence that supported his non-Listing determination. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *see also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).

The Commissioner points out that Dr. Deardorff diagnosed Plaintiff with borderline intellectual functioning. The ALJ likewise relied on the lack of a mental-retardation diagnosis or diagnostic corroboration in the record. *See* Tr. 16. Both the Commissioner and the ALJ miss the point of Listing 12.05C. Indeed, the Commissioner is usually quick to point out that a mere diagnosis does not establish that a claimant is under a "disability." *See, e.g., Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986); *see also* 20 C.F.R. §416.927(e)(1); *cf. Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)("The mere diagnosis of arthritis, of course, says nothing

about the severity of the condition."). Requiring such a diagnosis in cases of mental retardation would place formalism over substantive evidence, especially where the plain language of Listing 12.05C does not require evidence from a medical source diagnosing mental retardation. Thus, instead of requiring evidence of a diagnosis of mental retardation, the correct analysis focuses on whether the evidence of record meets or equals Listing 12.05C's criteria.

Similarly, the ALJ's finding that Plaintiff "was classified as developmentally handicapped in school but not specifically as mentally retarded...." (Tr. 16) is misdirected. The school psychologist's report does not describe the developmentally handicapped program or indicate the intellectual abilities or limitations of the students in the program. Consequently, the fact that Plaintiff was placed or continued in a program for the "developmentally handicapped" does not say anything probative about whether she was under a "disability" within the Social Security Act due to mental retardation or whether she satisfies Listing 12.05C's criteria. In addition, although the school psychologist diagnosed Plaintiff with borderline intellectual functioning, there is no indication that the criteria he used to diagnose Plaintiff was the same as Listing 12.05C's criteria. And the school psychologist did not find any of Plaintiff's test scores invalid. In this situation, and given Plaintiff's multiple IQ test scores, the Regulations allow her to rely on her lowest IQ test scores reported by the school psychologist to meet Listing 12.05C(1), rather than being forced to accept his mere diagnosis.

As to Dr. Deardorff's diagnosis of borderline intellectual functioning, there is no indication in his report that he considered the lowest of the three scores (verbal, performance, or full-scale) in reaching his diagnosis. Instead, his report tends to suggest the contrary. In diagnosing borderline intellectual functioning Dr. Deardorff merely concluded that, "*Test data* suggests that she is of borderline intelligence with weak memory skills." (Tr. 269)(emphasis added). Plaintiff's test data, however, is not inconsistent with mild mental retardation under Social Security's rules because Plaintiff's

verbal IQ has consistently ranged from 65 to 69.  Again, the Listings promise, "where verbal, performance, and full scale IQ's are provided in the Wechsler series, we use the *lowest* of those in conjunction with 12.05." §12.00(D)(6)(c), Appendix 1 to Subpart P, Part 404 (emphasis added).  Because Dr. Deardorff appeared to rely on Plaintiff's higher IQ tests scores to support his diagnosis of borderline intellectual functioning, his diagnosis says little, if anything, about whether Plaintiff's lowest verbal IQ scores satisfied Listing 12.05C(1).

The ALJ's reliance on counseling notes from FocusCare indicating that Plaintiff had an estimated average IQ does not constitute substantial evidence supporting his rejection of Plaintiff's lowest IQ scores.  The FocusCare records do not indicate that the estimate was based on actual standardized IQ testing they might have administered to Plaintiff, and the FocusCare records contain no explanation or date supporting this estimation.  For these reasons, and in light of Plaintiff's repeated verbal IQ scores between 65 and 70, the FocusCare estimation is not probative of whether Plaintiff satisfied Listing 12.05C.

For the above reasons, the ALJ erred by not applying the correct legal criteria to Plaintiff's IQ scores, and as a result, substantial evidence fails to support the ALJ's conclusion that Plaintiff's IQ test scores did not satisfy Listing 12.05C(1).

**4.**

As noted above, Listing 12.05C(2) required Plaintiff to show she has a physical or other mental impairment that imposes an additional and significant work-related limitation of function.  The ALJ's decision reveals the existence of such limitations.  The ALJ found that in addition to Plaintiff's cognitive difficulties, her severe impairments included chronic low back pain as well as depression and anxiety.  (Tr. 15).  In addition, the ALJ's assessment of Plaintiff's Residual Functional Capacity limited her to unskilled, simple, one- to two-step repetitive tasks because of her cognitive impairments, and also limited her to light exertional work with limitations on postural activities, on

concentration, and to low stress jobs with no production quotas.  (Tr. 17).  The Social Security Administration noted in its response to comments to changes in the Listings some years ago, "We always have intended the phrase to mean that the other impairment is a 'severe' impairment, as defined in §§ 404.1520(c) and 416.920(c)."  65 Fed. Register 50772.

Accordingly, the ALJ's recognition of the limitations imposed by Plaintiff's chronic low back pain, depression, and anxiety meet the requirements of Listing 12.05C(2).

**5.**

The Commissioner contends, "Plaintiff's adaptive functioning, as illustrated by her prior education, work experience, and independent living, belies any claim of disabling deficit.  Because Plaintiff did not establish mental retardation, she failed to satisfy the introductory criteria required by Listing 12.05(C)."  (Doc. #12 at 8).  This contention lacks merit.

Dr. Deardorff's report documents significant deficits in Plaintiff's functional academic skills.  He noted that Plaintiff's reading abilities were in the "mildly retarded range" with word recognition skills at the third grade level and comprehension skills even lower.  (Tr. 269).  This was consistent with testing during Plaintiff's achievements during her adolescent years.   Testing at 15 years and seven months showed that her ability to read and spell was below a third grade level and her arithmetic skills were only at a fourth grade level.  (Tr. 180).  Dr. Deardorff also noted significant deficits in self-care ("grooming and hygiene [were] not strong"); work ("She has held a number of jobs but has not worked steadily"); leisure activities ("She maintains a restricted activity level"); and social/interpersonal skills ("She has no friends").  (Tr. 266-70). The ALJ never mentioned this aspect of Dr. Deardorff's report but instead relied on the fact that she appeared to have earned "SGA-level wages for some years" and she had obtained "a driver's license (even if the test was read to her)."  (Tr. 16).  These facts, however, are

insufficient to support the ALJ's conclusion that Plaintiff did not meet Listing 12.05C in light of *Brown v. Secretary of Health and Human Services*, 948 F.2d 268 (6th Cir. 1991).

In *Brown*, the United States Court of Appeals for the Sixth Circuit found that the plaintiff, Mr. Brown's, IQ score of 68 was valid and that his abilities were within the DSM-III-R's diagnosis of mild mental retardation corresponding to an IQ between 50-55 and 70, pursuant to the DSM-III-R.[6] *Brown*, 948 F.2d at 269-70. The Court of Appeals explained: "Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at the grocery store; he can do his own laundry and clean his room; he has completed the sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him read a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove." *Brown*, 948 F.2d at 269-70. Like Mr. Brown's abilities, Plaintiff's accomplishment in earning a drivers' license and her prior education and work experience and her independent living are not inconsistent with a finding of mild mental retardation. *See id.* The record, moreover, reveals that Plaintiff has never worked on more than a part-time basis, *see* Tr. 308, and there is no evidence in the administrative record that she has ever lived on her own.

In addition, the Court of Appeals in *Brown* recognized that individuals with mild mental retardation, as defined by DSM-III-R, have abilities similar to those possessed by Mr. Brown, and by Plaintiff. The Court of Appeals explained that individuals with mild mental retardation, "[b]y their late teens ... can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, *virtually all people with Mild Mental Retardation can live successfully in the community, independently* or in supervised apartments or group homes (unless there is an associated

---

[6] Diagnostic and Statistical Manual of Mental Disorders, 3rd ed., Revised.

disorder that makes this impossible).” *Brown*, 948 F.2d at 270 (quoting DSM-III-R §317.00). Consequently, the ALJ’s reliance on Plaintiff’s purported ability to live independently fails to support his conclusion that she lacked deficits in adaptive functioning before age 22.

**6.**

For all the above reasons, Plaintiff’s Statement of Errors is well taken.[7]

**B.     Judicial Award of Benefits**

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under sentence four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision “with or without remanding the cause for rehearing.” *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

An Order remanding for payment of benefits is only warranted “where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking.” *Faucher*, 17 F.3d at 176.

A judicial award of benefits is warranted in the present case, because the evidence overwhelmingly shows that Plaintiff meets or equals all the criteria of Listing 12.05(C), or the evidence in support of this Listing criteria is strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Perhaps the strongest evidence confirming this is the combination of the school psychologists’ report and Dr. Deardorff’s report. Together

---

[7] Because of this conclusion and the resulting need to remand this case, an in-depth analysis of Plaintiff’s remaining challenge to the ALJ’s decision is unwarranted.

these document, along with the ALJ's findings at Steps 2 and 4, establish that Plaintiff's verbal IQ was in required range of Listing 12.05C(1); that she had a physical impairment (chronic low back pain causing certain lifting and postural restrictions) and mental impairment (depression and anxiety causing, in part, restriction to low-stress work) imposing additional and significant work-related limitations of function; and that she had academic and other deficits in adaptive functioning before age twenty two.

The record contains some contrary evidence but this evidence is weak. For example, the opinion of Dr. Waddell appears by way of his stamp of agreement with Ms. Casterline's report. Dr. Waddell provided no explanation for his agreement, no reference to any specific evidence supporting his opinions, and no information beyond his stamp and signature. The record, moreover, does not appear to indicate Ms. Casterline's status in the mental health profession. Her report does not indicate that she is a psychologist or a psychiatrist. Consequently, it is far from clear that she is an acceptable medical source within the meaning of the Regulations. *See* 20 C.F.R. §404.1513(a). Although does not wholly invalidate her report, *id*. at §404.1513(d), it tends to weaken the impact of her opinions, particularly when the record contains little else to conflict with the information in the reports of the school psychologist and Dr. Deardorff.

Lastly, a brief discussion is warranted on a somewhat divergent topic: Plaintiff's prior receipt of disability benefits. Plaintiff asserts that the record contains evidence she previously filed and received disability benefits. *See* Tr. 77, 413. Plaintiff testified during the ALJ's hearing that understood she had been granted benefits because of "being in special ed classes." (Tr. 414). She explained that the benefits ceased in 1996 when she started working. *Id.* Plaintiff's Statement of Errors notes that Plaintiff's "prior claim file was requested but it was not made a part of the administrative record before this Court." (Doc. #9 at 14).

"Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Drummond v. Commissioner of Social*

*Security*, 126 F.3d 837, 842 (6th Cir. 1997). "The burden is on the Commissioner to prove changed circumstances and therefore escape the principles of res judicata." *Id*. at 843.

In her Statement of Errors, Plaintiff assert that the Commissioner had neither offered evidence of medical improvement nor provided evidence concerning the previous grant of benefits. (Doc. #9 at 14). The Commissioner's Memorandum does not specifically address Plaintiff's *Drummond* argument. As a result, assuming Plaintiff's circumstances fit those addressed in *Drummond*, the Commissioner might be estopped from denying disability under Listing 12.05C due to the Commissioner's failure to show medical improvement. Yet because the present record contains scant information about the benefits Plaintiff previously received, *see* Tr. 77, 413, an award of benefits based on res judicata is not warranted at this time.

Still, because the evidence is either overwhelming or is strong while contrary evidence is weak that Plaintiff is under a "disability" within the meaning of the Social Security Act, a judicial award of benefits is warranted.

### IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      Plaintiff's case be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for payment of DIB and SSI consistent with the Social Security Act; and

3.      The case be terminated on the docket of this Court.


March 5, 2010

                                    ____s/Sharon L. Ovington____
                                    Sharon L. Ovington
                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).